## <u>AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT</u>

I, Ryan Fitzpatrick, being duly sworn, depose and state as follows:

### <u>Agent Background</u>

1.      I am a Task Force Officer with the Drug Enforcement Administration ("DEA") and have been assigned to the DEA since July 2025. I am currently assigned to the Manchester District Office of the New England Field Division. Prior to being assigned as a Task Force Officer, I completed 14 weeks of training at the New Hampshire Police Standards and Training Council Academy, located in Concord, New Hampshire. Since my graduation in April 2015, I have been a full-time, certified police officer in New Hampshire assigned to the Nashua, New Hampshire Police Department. My training included classroom preparation in drug-trafficking networks, drug identification, as well as practical application of surveillance, drug investigation, and arrest procedures. As a Nashua police officer, I have held the positions of patrol officer, street-crimes officer, detective assigned to special victims cases, and an illicit-drug detective assigned to the Nashua Police Department's Narcotics Intelligence Division, before being assigned to DEA as a Task Force Officer.

2.      I have participated in all aspects of drug investigations, including physical and electronic surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and the debriefing of defendants, informants, and witnesses who had personal knowledge regarding narcotics trafficking organizations, and have worked with federal, state, and local law enforcement to investigate such organizations. I have reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such

drugs. I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity to protect their operations, members, narcotics, and narcotics proceeds.

3.  As a result of my training and experience, I am familiar with the methods, routines, and practices of individuals involved in the use, sale, and trafficking of narcotics. I am also familiar with the various paraphernalia used to manufacture, compound, process, deliver, dispense, import, export, and use controlled substances such as fentanyl, heroin, cocaine, crack cocaine, marijuana, methamphetamine, and others.

4.  Based on my training and experience, I am familiar with the methods narcotics traffickers use to: (a) distribute, store, and transport narcotics; and (b) collect, expend, account for, transport, and launder drug proceeds. I am also familiar with the manner in which narcotics traffickers use personal and rented cars and trucks, common carriers, mail and private delivery services, and a variety of other motor vehicles to: (a) meet with co-conspirators, customers, and suppliers; (b) transport, distribute, and purchase narcotics; (c) transport funds used to purchase narcotics; and (d) transport the proceeds of narcotics transactions.

**<u>Purposes of the Affidavit</u>**

5.  I submit this affidavit in support of an application for a criminal complaint charging Carlos Aybar Franco ("FRANCO") with conspiracy to distribute and to possess with intent to distribute controlled substances, beginning in or about March 2026 and continuing through in or about August 2026, in violation of Title 21, United States Code, Section 846 (the "Charged Offense").

6.  Based on the facts set forth in this affidavit, there is probable cause to believe that FRANCO has committed the Charged Offense.

7.    As a result of my personal participation in the investigation, review of reports submitted by other law enforcement personnel, and my consultations with other law enforcement officers, I am familiar with this investigation. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. I submit this affidavit for the limited purpose of establishing probable cause for the requested criminal complaint. Accordingly, I have not included each and every fact known to me and other law enforcement officers involved in this investigation.

## Probable Cause

### Background of the Investigation

8.    In January 2026, investigators learned about a Lawrence-based drug trafficking organization ("DTO") through a cooperating source ("CS").[1] The CS explained that Co-Conspirator 1, an individual located in the Dominican Republic, who had previously lived north of Boston, brokered narcotics transactions through Facebook Messenger.[2] Following preliminary purchases, an undercover investigator ("UC") was introduced to the DTO and completed several undercover drug purchases.

---

[1] The CS has been cooperating with law enforcement since 2026 and is cooperating in exchange for possible charging or sentencing consideration related to a non-violent drug arrest. I am not disclosing the police department that supervises the CS to protect the identity of the CS. The CS has provided information regarding additional targets that law enforcement has investigated and independently corroborated. Therefore, investigators find the CS credible and believe information provided by the CS to be reliable. The CS's criminal history primarily involves drug offenses. The CS has one 2018 charge for a "False Report to Law Enforcement", however, this case was ultimately *nolle prosequi*. This CS would not testify at a trial.

[2] Investigators believe they have identified Co-Conspirator 1. I am withholding his name from this affidavit because Co-Conspirator 1 is not being charged in this criminal complaint.

*On March 23, 2026, Co-Conspirator 1 Organized a Fentanyl Transaction with the UC; Co-Conspirator 2 Delivered the Fentanyl to the UC.*

9.      On March 23, 2026, over recorded WhatsApp messages and calls, the UC agreed to pay Co-Conspirator 1 $3,000 in exchange for approximately 10 grams of uncut fentanyl, 80 grams of cut fentanyl, and 200 counterfeit Percocet pills containing fentanyl. To complete the transaction, Co-Conspirator 1 directed the UC to pick up Co-Conspirator 2[3] at her home in Lawrence, Massachusetts, and transport her to the area of 344 Hampshire Street in Lawrence.

10.      At approximately 4:40 p.m., the UC picked up Co-Conspirator 2. The UC then transported Co-Conspirator 2 to 344 Hampshire Street and gave her $1,300. At approximately 5:25 p.m., Co-Conspirator 2 exited the UC vehicle, walked to a parking lot adjacent to 344 Hampshire Street, and entered the front passenger seat of a silver 2014 Mercedes, bearing Massachusetts registration TCF617, registered to Co-Conspirator 3,[4] at 270 Canal Street, Apartment 221, Lawrence, Massachusetts, believed to be used by Co-Conspirator 3 and FRANCO ("Subject Vehicle 1"). All interactions in the UC vehicle were recorded with audio and visual recording equipment.

11.      At approximately 5:26 p.m., Co-Conspirator 2 exited Subject Vehicle 1 and returned to the UC vehicle. The UC provided Co-Conspirator 2 with the remaining $1,700 and in return, Co-Conspirator 2 provided the UC with a hard, chunk-like substance wrapped in plastic, a brown powdery substance wrapped in plastic, and a bag of 200 blue pills marked with an "M" and "30" on each side. Co-Conspirator 2 then exited the vehicle.

---

[3] Investigators believe they have identified Co-Conspirator 2. I am withholding her name from this affidavit because Co-Conspirator 2 is not being charged in this criminal complaint.

[4] Investigators believe they have identified Co-Conspirator 3. I am withholding her name from this affidavit because Co-Conspirator 3 is not being charged in this criminal complaint.

12.     Investigators photographed the pure fentanyl, cut fentanyl, and counterfeit Percocet pills made with fentanyl. The fentanyl weighed approximately 10.9 grams (pure fentanyl), 80.9 grams (cut fentanyl), and 24.1 grams (counterfeit Percocet pills believed to be fentanyl). Investigators sent the various types of fentanyl to the laboratory for further testing. The cut fentanyl did not test positive for fentanyl. Laboratory analysis confirmed the other substances (referred to as the pure fentanyl and counterfeit Percocet pills) did contain fentanyl.

*On April 20, 2026, Co-Conspirator 1 Organized a Fentanyl and Methamphetamine Transaction with UC; Co-Conspirator 2 Delivered Fentanyl and Methamphetamine to the UC.*

13.     On April 20, 2026, over recorded WhatsApp messages and calls, the UC agreed to pay Co-Conspirator 1 $3,000 in exchange for approximately 40 grams of uncut fentanyl, 100 grams of cut fentanyl, 200 counterfeit Percocet pills containing fentanyl, and a sample of methamphetamine. The UC was directed to meet with Co-Conspirator 2 in the area of 344 Hampshire Street, Lawrence, Massachusetts.

14.     At approximately 1:56 p.m., investigators observed Subject Vehicle 1 enter the parking lot of 352 Hampshire Street. Investigators identified Co-Conspirator 3 as the front passenger of Subject Vehicle 1. Investigators identified FRANCO as the operator of the vehicle. At approximately 2:00 p.m., the UC arrived in the area of 344 Hampshire Street and parked behind a tow truck as instructed by Co-Conspirator 1. At approximately 2:02 p.m., Co-Conspirator 2 exited the front passenger's seat of the tow truck and entered the UC vehicle. While inside of the UC vehicle, Co-Conspirator 2 communicated via video call with a male the UC identified as Co-Conspirator 1. The UC, Co-Conspirator 2, and Co-Conspirator 1 agreed that the UC would provide Co-Conspirator 2 with $1,200 as a preliminary payment.

15.    At approximately 2:03 p.m., Co-Conspirator 2 exited the UC vehicle and entered Subject Vehicle 1, where FRANCO and Co-Conspirator 3 were located. A few minutes later, Co-Conspirator 2 emerged from Subject Vehicle 1 and returned to the UC vehicle. The UC provided Co-Conspirator 2 with the remaining $1,800 in exchange for a hard chunk-like substance wrapped in plastic, a brown powdery substance wrapped in plastic, 200 blue pills wrapped in plastic, and a plastic bag containing a crystal-like substance.

16.    At approximately 2:10 p.m., Subject Vehicle 1 departed the area. Subject Vehicle 1 stopped at an intersection near Brookfield Street. Investigators observed FRANCO exit the driver's side door and leave the area on foot. Co-Conspirator 3 entered the driver's seat and traveled non-direct routes through Lawrence and Methuen.

17.    Investigators photographed the pure fentanyl, cut fentanyl, counterfeit Percocet pills made with fentanyl, and methamphetamine. The fentanyl weighed approximately 45.7 grams, 117 grams, and 53.2 grams, respectively. The methamphetamine weighed 32.2 grams. Investigators sent the various narcotics to the laboratory for further testing. The cut fentanyl did not test positive for fentanyl. Laboratory analysis confirmed the other substances (referred to as the pure fentanyl, counterfeit Percocet pills, and methamphetamine) did contain fentanyl and methamphetamine.

*On May 6, 2026, Co-Conspirator 1 Organized a Fentanyl and Methamphetamine Transaction with the UC; FRANCO Delivered the Fentanyl and Methamphetamine to the UC.*

18.    On May 6, 2026, over recorded WhatsApp messages and calls, the UC agreed to pay Co-Conspirator 1 $3,500 in exchange for 100 counterfeit Percocet pills containing fentanyl and a half a pound of methamphetamine. To begin the transaction, Co-Conspirator 1 directed the UC to meet with Co-Conspirator 2 in the area of 421 Merrimack Street in Methuen, Massachusetts.

19.     At approximately 4:30 p.m., investigators observed Subject Vehicle 1 in the parking lot of 344 Hampshire Street. Investigators observed FRANCO accessing various compartments within the vehicle. FRANCO also traveled back and forth from Subject Vehicle 1 to the El Parcha barber shop located within the nearby plaza.

20.     At approximately 5:00 p.m., the UC arrived at 421 Merrimack Street in Methuen and provided Co-Conspirator 2 with $2,000 (the UC owed $1,000 from the April 20, 2026, transaction, described above). Co-Conspirator 2 exited the UC vehicle and returned to the building located at 421 Merrimack Street. Over WhatsApp, Co-Conspirator 1 then instructed the UC to travel to 344 Hampshire Street in Lawrence to complete the transaction.

21.     At approximately 5:20 p.m., the UC arrived at the parking lot of 344 Hampshire Street. While communicating with Co-Conspirator 1 via WhatsApp, the UC saw FRANCO accessing Subject Vehicle 1 and walking directly to the UC vehicle. FRANCO entered the UC vehicle and spoke in Spanish to Co-Conspirator 1 on WhatsApp. In English, Co-Conspirator 1 then told the UC that FRANCO had less methamphetamine than they had agreed upon. Reflecting this difference, the UC provided FRANCO with $600. In return, FRANCO handed the UC a plastic bag containing 100 blue pills and another plastic bag containing a crystal-like substance, believed to be methamphetamine. FRANCO then left the area in Subject Vehicle 1. All interactions in the UC vehicle were recorded with audio and visual recording equipment.

22.     Investigators photographed the counterfeit Percocet pills made with fentanyl and methamphetamine. The fentanyl pills weighed 14.6 grams, and the methamphetamine weighed 14.4 grams. Investigators sent the various narcotics to the laboratory for further testing. Laboratory analysis confirmed that the substances contained fentanyl and methamphetamine.

7

*On May 14, 2026, Co-Conspirator 1 Organized a Fentanyl Transaction with the UC; FRANCO and Co-Conspirator 3 Delivered the Fentanyl to the UC.*

23.    On May 14, 2026, over recorded WhatsApp messages and calls, the UC agreed to pay Co-Conspirator 1 $2,700 in exchange for 100 counterfeit Percocet pills containing fentanyl and 20 grams of uncut fentanyl. To begin the transaction, Co-Conspirator 1 directed the UC to meet Co-Conspirator 2 at 421 Merrimack Street in Methuen.

24.    At approximately 5:07 p.m., investigators located Subject Vehicle 1 idling on the northside of 270 Canal Street. Investigators believe that Co-Conspirator 3 lives at 270 Canal Street, Apartment 221 in Lawrence, Massachusetts (the "Subject Residence"). At approximately 5:22 p.m., after handing Co-Conspirator 2 $1,500 near 421 Merrimack Street, Co-Conspirator 1 directed the UC to travel to 1 Mill Street in Lawrence. This location was directly north over a small access bridge near where Co-Conspirator 3 had parked Subject Vehicle 1.

25.    At approximately 5:39 p.m., the UC arrived at 1 Mill Street. Once the UC arrived, investigators observed Subject Vehicle 1 leave its parking space outside of the Subject Residence and drive to 1 Mill Street. Two individuals exited Subject Vehicle 1 and entered the front passenger's seat and rear passenger's seat of the UC vehicle. The UC identified these individuals as FRANCO and Co-Conspirator 3. FRANCO provided the UC with a hard chunk-like substance wrapped in plastic, a cylindrical stick of brown powder wrapped in plastic, and 100 blue pills in a plastic bag. In addition, FRANCO provided the UC with the number (693) 264-9984 (the "9984 Number"), so that the UC could contact FRANCO and Co-Conspirator 3 directly. Based on training and experience, investigators believed that FRANCO and Co-Conspirator 3 planned to conduct future transactions with the UC alone, effectively cutting out the Dominican broker, Co-Conspirator 1. Following the transaction, Co-Conspirator 3 drove in Subject Vehicle 1 to the

parking area outside the Subject Residence. Investigators then observed Co-Conspirator 3 enter the rear entrance of the Subject Residence building. All interactions in the UC vehicle were recorded with audio and visual recording equipment.

26.    Investigators photographed the pure fentanyl, cut fentanyl packaged in as a cylindrical stick, and counterfeit Percocet pills made with fentanyl. The fentanyl weighed approximately 20.78 grams, 10.49 grams, and 12.94 grams, respectively. Investigators sent the various types of fentanyl to the laboratory for further testing and the laboratory confirmed that all three substances contained fentanyl.

*On May 27, 2026, FRANCO and Co-Conspirator 3 Organized a Fentanyl and Methamphetamine Transaction with the UC and Delivered the Narcotics to the UC.*

27.    On May 27, 2026, over recorded WhatsApp messages and calls with the 9984 Number, the UC agreed to pay FRANCO and Co-Conspirator 3 $6,000 in exchange for 200 counterfeit Percocet pills containing fentanyl, 100 grams of cut fentanyl, and a half a pound of methamphetamine. The parties agreed to meet in the parking lot of the Longhorn Steakhouse located at 1580 South Willow Street in Manchester, New Hampshire. Investigators captured the below transaction with audio and visual recording equipment.

28.    At approximately 4:19 p.m., investigators observed FRANCO and Co-Conspirator 3 exit the Subject Residence in Lawrence, Massachusetts. FRANCO carried a black plastic bag. Co-Conspirator 3 entered the driver's seat of Subject Vehicle 1 and FRANCO entered the front passenger's seat of Subject Vehicle 1. In addition, an unknown female entered the back seat of the car. Co-Conspirator 3 dropped off this unknown female at a location in Lawrence.

29.    At approximately 5:15 p.m., Subject Vehicle 1 parked at the predetermined meeting location directly adjacent to the UC vehicle. Co-Conspirator 3 exited the driver's seat of Subject

Vehicle 1 and entered the front passenger's seat of the UC vehicle. FRANCO remained within the front passenger's seat of Subject Vehicle 1. FRANCO, the UC, and Co-Conspirator 3 communicated with one another through open vehicle windows as the pre-planned drug purchase occurred. During this interaction, Co-Conspirator 3 introduced herself as "Alex" and FRANCO introduced himself as "Pedro". The UC provided Co-Conspirator 3 with $6,000. Co-Conspirator 3 provided the UC with a quantity of pre-packaged blue pills, a brown powder in the form of ten pressed "sticks,' and a crystal-like substance in a plastic baggie. At approximately 5:19 p.m., Co-Conspirator 3 re-entered Subject Vehicle 1 with the $6,000 and traveled directly from Manchester, New Hampshire to Lawrence, Massachusetts.

30.     At approximately 5:57 p.m., in Lawrence, at the intersection of McFarlin Court and Bay State Road, FRANCO and Co-Conspirator 3 both exited Subject Vehicle 1. Co-Conspirator 3 then entered an unoccupied white 2016 Ford Explorer, bearing Massachusetts registration 5JDS11, registered to Naomi S. Garcia Reyes, at 32 Kenwood Road, Apartment 1, Methuen, Massachusetts, believed to be used by FRANCO and Co-Conspirator 3 ("Subject Vehicle 2"), and FRANCO entered the driver's seat of Subject Vehicle 1.

31.     At approximately 6:05 p.m., Co-Conspirator 3 drove Subject Vehicle 2 to the side of the roadway between Appleton and Jackson Street. She exited Subject Vehicle 2 and spoke with unknown individuals for approximately 25 minutes. Co-Conspirator 3 then traveled in Subject Vehicle 2 directly to the Subject Residence and parked Subject Vehicle 2 in the adjacent parking lot. She entered the apartment building from the rear entrance and ascended a staircase to the second floor. Investigators also observed FRANCO drive in Subject Vehicle 1 directly to the parking lot of 346 Hampshire Street, where he entered El Parcha barbershop.

32.     Investigators photographed the cut fentanyl packaged as ten cylindrical sticks, counterfeit Percocet pills made with fentanyl, and the methamphetamine. The cut fentanyl weighed approximately 104.8 grams, and the counterfeit pills weighed 26.3 grams. The methamphetamine weighed approximately 228.1 grams. Investigators sent the fentanyl and methamphetamine to the laboratory for further testing and the laboratory confirmed that these substances contained fentanyl and methamphetamine.

*On June 10, 2026, FRANCO and Co-Conspirator 3 Delivered Fentanyl and Methamphetamine to the UC.*

33.     On June 10, 2026, over recorded WhatsApp messages and calls with the 9984 Number, in lightly coded language, the UC agreed to pay FRANCO and Co-Conspirator 3 $5,000 in exchange for approximately 100 grams of cut fentanyl, and one pound, or approximately 453.4 grams, of methamphetamine. To complete the transaction, the parties agreed to meet at 216 Haverhill Street in Methuen, Massachusetts.

34.     The same day, June 10, 2026, at approximately 4:55 p.m., investigators observed Subject Vehicle 2 parked near El Parcha barbershop located at 346 Hampshire Street in Lawrence. At that time, investigators watched Subject Vehicle 2 depart from the area.  Investigators observed Co-Conspirator 3 operating Subject Vehicle 2 and FRANCO riding in the passenger seat.

35.     At approximately 5:19 p.m., Subject Vehicle 2 entered the parking lot of 216 Haverhill Street in Methuen, the meeting location for the drug transaction with the UC. At that time, investigators observed FRANCO exit the passenger seat carrying a white plastic shopping bag. Co-Conspirator 3 exited the driver's seat of Subject Vehicle 2. Both FRANCO and Co-Conspirator 3 then entered the UC vehicle. A picture of FRANCO and Co-Conspirator 3 (redacted), adjacent to the UC vehicle, is included below:

11



36.    In the UC vehicle, the UC handed FRANCO $5,000 and FRANCO provided the UC with the white plastic shopping bag, which contained eleven cylindrical sticks of cut fentanyl and one sealed plastic bag containing methamphetamine. This interaction in the UC vehicle was captured with audio and visual recording equipment. After receiving the $5,000, FRANCO and Co-Conspirator 3 returned to Subject Vehicle 2 with the $5,000 and departed the area. Investigators observed FRANCO and Co-Conspirator 3 return directly to El Parcha barbershop. At approximately 6:26 p.m., Co-Conspirator 3 returned to the Subject Residence in Subject Vehicle 2.

37.    Investigators photographed the cut fentanyl and methamphetamine. The fentanyl weighed approximately 117.9 grams, and the methamphetamine weighed approximately 454.2 grams. Investigators sent the fentanyl and methamphetamine to the laboratory for further testing and the laboratory confirmed that these substances contained fentanyl and methamphetamine.

*On July 1, 2026, FRANCO and Co-Conspirator 3 Arranged a Fentanyl and Methamphetamine Transaction; Co-Conspirator 3 Delivered Fentanyl and Methamphetamine to the UC.*

38.     On July 1, 2026, over recorded WhatsApp messages and calls with the 9984 Number, the UC agreed to pay FRANCO and Co-Conspirator 3 $5,000 in exchange for approximately 100 grams of cut fentanyl, and one pound, or approximately 453.4 grams, of methamphetamine. Based on the conversations, investigators believe that FRANCO would text the UC from the 9984 Number, while Co-Conspirator 3 would call the UC. To complete the transaction, the parties agreed to meet at 2:30 p.m. at 216 Haverhill Street in Methuen, Massachusetts.

39.     At approximately 1:00 p.m., investigators observed FRANCO and Co-Conspirator 3 exit the Subject Residence. At that time, investigators called the 9984 Number and observed FRANCO answer the call and hand the telephone to Co-Conspirator 3. The UC then spoke to Co-Conspirator 3 and confirmed the details of the scheduled transaction. Investigators also observed both Subject Vehicle 1 and Subject Vehicle 2 parked outside of the Subject Residence. FRANCO and Co-Conspirator 3 then entered Subject Vehicle 1, which was parked outside of the Subject Residence.

40.     At approximately 1:38 p.m., investigators observed FRANCO and Co-Conspirator 3 at 68-70 Brook Street in Lawrence, entering the south side of the building. An overhang obscured investigators' view of FRANCO and Co-Conspirator 3 entering and exiting the building. At 2:05 p.m., FRANCO and Co-Conspirator 3 arrived back at the Subject Residence. They both exited Subject Vehicle 1 and entered the Subject Residence building. Shortly thereafter, Co-Conspirator 3 exited the building alone and entered Subject Vehicle 1.

41. At approximately 2:32 p.m., Subject Vehicle 1, driven by Co-Conspirator 3, entered the parking lot of 216 Haverhill Street in Methuen, where the UC was already parked in the UC vehicle. At that time, Co-Conspirator 3, who was now alone, exited the driver's seat of Subject Vehicle 1 and entered the passenger side of the UC vehicle.

42. In the UC vehicle, the UC handed Co-Conspirator 3 $5,000 and Co-Conspirator 3 provided the UC with a white plastic shopping bag, which contained ten cylindrical sticks of cut fentanyl, and one sealed plastic bag containing methamphetamine. Investigators captured the interaction inside the UC vehicle with audio and visual recording equipment. After receiving the $5,000, Co-Conspirator 3 returned to Subject Vehicle 1 and departed the area. Investigators observed Co-Conspirator 3 stop at a business, Botanica La Mercedes, before returning to the Subject Residence.

43. Investigators photographed the cut fentanyl and methamphetamine. The fentanyl weighed approximately 105 grams, and the methamphetamine weighed approximately 481.7 grams. Investigators sent the fentanyl and methamphetamine to the laboratory for further testing and the laboratory confirmed that these substances contained fentanyl and methamphetamine.

*On July 16, 2026, FRANCO and Co-Conspirator 3 Delivered Methamphetamine to the UC.*

44. On July 16, 2026, the UC called FRANCO and Co-Conspirator 3 at the 9984 Number to arrange the purchase of methamphetamine. Co-Conspirator 3 spoke on the phone to the UC, but the UC could hear FRANCO speaking to Co-Conspirator 3 in Spanish in the background of the call. In lightly coded language, FRANCO and Co-Conspirator 3 agreed to sell seven pounds of methamphetamine for $21,000 to the UC. These calls and text messages were preserved and recorded.

45.     At approximately 12:39 p.m., investigators observed FRANCO drive Subject Vehicle 1 to El Parcha barbershop. At approximately 1:55 p.m., investigators observed FRANCO and Co-Conspirator 3 outside of El Parcha barbershop standing next to Subject Vehicle 1 and Subject Vehicle 2. Co-Conspirator 3 ultimately entered Subject Vehicle 2 and drove to the Subject Residence alone, arriving at 2:27 p.m. At approximately 2:57 p.m., Co-Conspirator 3 exited the main door of the Subject Residence building and entered the driver's seat of Subject Vehicle 2.

46.     At approximately 3:03 p.m., Co-Conspirator 3 traveled back to El Parcha barbershop and picked up FRANCO. At 3:15 p.m., they arrived at 119-121 Springfield Street in Lawrence. At approximately 3:20 p.m., they arrived at 68-70 Brook Street in Lawrence. FRANCO exited Subject Vehicle 2 and appeared to enter the building, though investigators could not see beyond an overhang at the entrance to the building, which obstructed their view.

47.     At approximately 3:30 p.m., FRANCO and Co-Conspirator 3 drove Subject Vehicle 2 directly to the meeting location of 248 Haverhill Street in Methuen, Massachusetts. At approximately 3:49 p.m., Co-Conspirator 3 exited the driver's seat of Subject Vehicle 2 and entered the front passenger seat of the UC vehicle. Investigators recorded this interaction with audio and visual recording equipment. In addition, investigators recorded this interaction using a drone, which flew at a distance overhead. A photograph from the drone footage is below, showing FRANCO walking towards the UC vehicle.



48.    Once in the UC Vehicle, the UC handed Co-Conspirator 3 a bag containing $21,000. Co-Conspirator 3 counted the funds. FRANCO then handed Co-Conspirator 3 a tan duffle bag through the passenger side window of the UC Vehicle. Co-Conspirator 3 then handed the UC eight individually wrapped packages containing a crystal-like substance of methamphetamine. Co-Conspirator 3 then exited the UC vehicle and left the area in Subject Vehicle 2 with FRANCO.

49.    At approximately 4:08 p.m., FRANCO and Co-Conspirator 3 arrived at 119-121 Springfield Street in Subject Vehicle 2. Investigators could not see whether they exited the car with any items. FRANCO and Co-Conspirator 3 then drove to El Parcha barbershop in Subject Vehicle 2, arriving at 4:30 p.m. Co-Conspirator 3 dropped off FRANCO and left the area. Investigators observed Co-Conspirator 3 drive to a "Best Fried Chicken" restaurant located at Lowell and Oxford Street and exit the business carrying a bag of food. At approximately 4:57 p.m., Co-Conspirator 3 traveled directly to the Subject Residence in Subject Vehicle 2, parked Subject Vehicle 2 in the adjacent parking lot, and entered the Subject Residence Building through the main entrance.

50.    After the transaction, the UC met with investigators. The UC provided investigators with eight bags of a crystal-like substance weighing approximately seven pounds or 3,396.7 grams,

wrapped in cellophane, which the UC obtained from Co-Conspirator 3. Investigators sent the methamphetamine to the laboratory for further testing and the laboratory confirmed that this substance contained methamphetamine.

*On July 28, 2026, FRANCO and Co-Conspirator 3 Used the 9984 Number to Discuss a Methamphetamine Transaction to Occur on August 6, 2026.*

51.    On July 28, 2026, FRANCO and Co-Conspirator 3 called the UC from the 9984 Number. In loosely coded language, Co-Conspirator 3, who translated for FRANCO, offered to sell the UC approximately 8 to 10 pounds of methamphetamine in the near future. In addition, on this call, Co-Conspirator 3, in loosely coded language, asked that this transaction occur at her house, so that she could count the proceeds in a secure place. Based on training and experience, and investigators observing Co-Conspirator 3 living at the Subject Residence, I believe that Co-Conspirator 3 meant she wanted the transaction to occur at the Subject Residence.

52.    On August 4, 2026, the parties agreed to meet in two days (*i.e.*, August 6, 2026) at 240 Canal Street in Lawrence, Massachusetts, which is adjacent to the Subject Residence and shares the same parking lot, to conduct the narcotics transaction.

## Conclusion

53.    WHEREFORE, I submit that there is probable cause to believe that FRANCO conspired to distribute and possess with intent to distribute controlled substances, beginning in or about March 2026, and continuing through in or about August 2026, in violation of Title 21, United States Code, Section 846.

Respectfully submitted,

*Ryan Fitzpatrick by JCB*

_____

Ryan Fitzpatrick, Task Force Officer
Drug Enforcement Administration


Sworn to telephonically in accordance
with Fed. R. Crim. P. 4.1 on August __5__, 2026.


_____
Jennifer C. Boal
United States Magistrate Judge

18